## Adriansen v. Marworth

C.P. of Lackawanna County, no. 01 CV 2633

*Joseph Lenahan,* for plaintiff.

*Daniel Rovner,* for defendants.

MINORA, *J.,* July 14, 2006—

## INTRODUCTION

The matter before the court involves a petition to appeal a decision from a special trial master regarding discovery issues in the underlying action. The special trial master decision under review is dated November 2, 2005. The parties have presented both written and oral arguments to the court rendering this matter fit for adjudication.

## STATEMENT OF THE CASE

A brief rendition of the factual history is required to adequately preface the issues before the court. Allegedly, Gary Williams, now deceased, was admitted to Marworth, a licensed drug and alcohol treatment facility in Waverly, Pennsylvania, on June 26, 2000.[1] Additionally, it is asserted by the plaintiff that Marworth is affiliated with defendant Geisinger Health Systems Inc. and defendant Geisinger Clinic, which worked in conjunction with defendant Marworth to offer medical treatment to patients at the facility while undergoing drug and alcohol rehabilitation. Upon decedent's admittance to the facility, he was entered into the Level III program, which is the highest level of treatment available. (See plaintiff's complaint ¶15.) As declared in the complaint, the initial impression the staff received from the decedent was that he showed signs of anxiety and alcohol withdrawal upon

---

1. Marworth is licensed by the Pennsylvania Department of Health, Office of Drug and Alcohol Programs, and is accredited by the Joint Commission on Accreditation of Healthcare Organization (JCAHO).

entry. (See plaintiff's complaint ¶16.) On the day of admittance, decedent was administered 90 mg of Phenobarbital to reduce his withdrawal symptoms of nausea, tremors, sweats, and anxiety at several intervals; 5:45 p.m., 8 p.m. and 10:30 p.m. (See plaintiff's complaint ¶18-20.)[2] The decedent received additional doses of Phenobarbital again on June 27, 2000 at four-hour intervals. (See plaintiff's complaint ¶23.) Reportedly, the decedent did not exhibit positive changes after each treatment according to his patient progress report. (*Id.* at ¶23.)

The following day, June 28, 2000, the deceased was administered additional doses of Phenobarbital at varying times; he allegedly exhibited no improvement, but instead, delusions, disorientation and hallucinations. (See complaint ¶¶24-30.) Due to this behavior, a counselor of the Marworth staff contacted the deceased's family to remove him from the facility, which they declined. (*Id.* at ¶¶30, 31.) In the early evening hours of June 28, 2000, members of the facility contacted a nearby hospital (Community Medical Center) regarding the decedent's behavior/condition, yet there is no documentation of recommended course of treatment. (*Id.* at ¶32.) It is reported that at approximately 8:30 p.m., the decedent crawled out of his window and appeared tapping on the outside of the Marworth counseling office window. (*Id.* at ¶35.) After he was returned to his room, another incident occurred that evening of decedent displaying signs of confusion and disorientation. (*Id.* at ¶37.) During the early morning hours of June 29, 2000, the decedent requested

---

2. As alleged by the plaintiff, Phenobarbital is administered to help control seizures, and its typical effect is to induce sleep. Yet, the drug has an adverse reaction on some individuals causing them to experience nervousness and agitation. (See plaintiff's complaint ¶ 21.)

and was administered sleep medications. (*Id.* at ¶38.) The progress notes indicate that the decedent was asleep and in bed at 2:15 a.m. and 3:10 a.m. (*Id.* at ¶39.) At 6:10 a.m., on June 29, 2000, Sue Blackledge, a nurse's aide, entered the decedent's room to record his vital signs, but he was missing; at this time Blackledge alerted the facility staff that the decedent had "eloped." (*Id.* at ¶¶40, 41.) Both the Waverly police and the state police were contacted and conducted an investigation in an effort to locate the decedent.

On September 30, 2000, a group of individuals were hunting in a wooded area in Waverly when they found the decedent's body, lying face down, in a small creek. (*Id.* at ¶49.) Later, an autopsy was performed on decedent, yet due to the "extensive postmortem decomposition" of the body, the cause of death was undeterminable. (*Id.* at ¶51.)

This cause of action was commenced by the plaintiff, Susan Adriansen, sister and administrator of the estate of Gary Williams, deceased.[3] A writ of summons was entered on May 18, 2001, which was later reinstated on July 24, 2001. The complaint was filed on November 11, 2001, thereby instituting this wrongful death and survival action, including the following: one count of negligence against defendant, Marworth; a second count of vicarious liability asserted against Geisinger Clinic; and a third count, also asserting vicarious liability, against Geisinger Health Systems Inc. Contained within Count

---

3. Susan D. Adriansen was duly authorized by the Register of Wills of Bergen County, New Jersey, as personal representative of the estate of Gary Williams and issued letters of administration on December 1, 2000.

One asserted against defendant Marworth are allegations of negligence on the part of the medical staff, physicians and nurses in regard to the decedent's need for medical attention, his adverse reaction to medications provided, and failure to prevent the elopement among a litany of other errors.

### Petition for Appeal From
### Special Trial Master Decision

The main subject of this appeal concerns the personnel file of Steve Adams, RN (now deceased).[4] Adams was the head nurse on duty at Marworth on the evening of June 28, 2000, through the morning hours of June 29, 2000, which is the period of time in which the plaintiff decedent had eloped from the Marworth facility. On April 29, 2000, during the discovery phase of this litigation, the plaintiff's counsel requested the production of said personnel file from defendant Marworth. Marworth forwarded a letter dated May 16, 2005, to plaintiff's counsel identifying all those documents that defendant voluntarily would produce, and further identifying those requested documents it declined to produce asserting the same to be privileged and confidential. On August 5, 2005, the defendant, by counsel, forwarded a detailed log entitled "Steve Adams Personnel File Document Log With Identified Privileges," wherein the defendant provided descriptions of all documents produced and all items withheld indicating the privilege and objections relied upon, particularly the Peer Review Protection Act

---

4. Steve Adams, R.N., is reportedly deceased per defendants, Marworth, Geisinger Health System Foundation and Geisinger Clinic's petition for appeal of special trial master, ¶ 8.

(PRPA) 63 P.S. §425.1 et seq. (See defendants' exhibit "B" to petition for appeal of the special trial master decision.) The items regarded as privileged by the defendants are the subject of the present appeal from the special trial master decision of November 2, 2005. The specific items in controversy include the following:

(12) Performance improvement plan, dated April 24, 2001;

(15)-(19) Geisinger Marworth performance appraisal and development plans;

(23) Department of Nursing orientation checklist evaluation;

(31) 6/13/00 Infection control orientation checklist;

(59)-(62) Marworth telephone reference evaluations;

(66) 5/22/00 Marworth interview sheet evaluating candidates.

The plaintiff filed a motion to compel production of the personnel file of Steve Adams, deceased, which was presented to Special Trial Master Richard S. Campagna. The defendant responded to the plaintiff's motion and STM Campagna entertained oral argument on September 12, 2005. By order dated October 12, 2005, Master Campagna required the defendants to submit the subject documents for an in camera review within 10 days. After the master reviewed the documents, he noted his findings in the decision and order dated November 2, 2005. Therein it was stated that the items withheld by the defendant, under the guise of peer review objections, during discovery, failed to meet the criteria necessary for peer review protection under 63 P.S. §425.1 et seq.

This court has discussed the proper scope of discovery in *Yadouga v. Cruciani,* 66 D.&C.4th 164, 167 (Lacka. Cty. 2004), as follows:

"The purpose of the Pennsylvania 'discovery rules is to prevent surprise and unfairness and to allow a fair trial on the merits.' *Dominick v. Hansen,* 753 A.2d 824, 826 (Pa. Super. 2000). To that end, ... 'discovery is liberally allowed with respect to any matter, not privileged, which is relevant to the cause being tried.' *George v. Schirra,* 814 A.2d 202, 204 (Pa. Super. 2002). A discovery request is not objectionable on the grounds that it seeks 'an opinion or contention that relates to a fact or the application of law to fact' or that 'the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to discovery of admissible evidence.' Pa.R.C.P. 4003.1(b), (c). Furthermore, any limitations or restrictions upon discovery should be construed narrowly. *McAndrew v. Donegal Mutual Insurance Co.,* 56 D.&C.4th 1, 7 (Lacka. Cty. 2002); *Schwab v. Milks,* 8 D.&.C.4th 557, 558 (Lacka.Cty. 1990)."

We first note that the defendants have properly brought their discovery appeal of the decision of special trial master before this court pursuant to Lacka.Cty.R.C.P. 4000.1(b), which permits an order of an STM to be appealed de novo by presentation of a motion to the court to be filed within 10 days of the appealed decision and upon proof of payment to the court of appropriate costs. We find that the present appeal is properly before this court.

It is the defendant's argument that the documents referenced as numbers 12, 15-19, 23, 31, 59-62 and 66, all not produced from Adams' file, fall within the scope and

nature of those protected by the Peer Review Protection Act (PRPA) and not subject to discovery. Peer review protection is enjoyed only by those considered a "professional health care provider." 63 P.S. §425.2.[5] We are satisfied that the Marworth defendant, Adams' employer, is provided protection under the PRPA as it is licensed by the Pennsylvania Department of Health, Office of Drug and Alcohol Programs, and is accredited by the Joint Commission on Accreditation of Healthcare Organization (JCAHO).

The crux of our determination lies on the evaluation of the PRPA, specifically, the scope of the Act and its affect on confidentiality of documents.[6] As directed by

---

5. 63 P.S. §425.2, Professional health care provider means

"(1) individuals or organizations who are approved, licensed or otherwise regulated to practice or operate in the health care field under the laws of the Commonwealth, including, but not limited to the following individuals or organizations:

"(i) a physician;

"(ii) a dentist;

"(iii) a podiatrist;

"(iv) a chiropractor;

"(v) an optometrist;

"(vi) a psychologist;

"(vii) a pharmacist;

"(viii) a registered nurse or practical nurse;

"(ix) a physical therapist;

"(x) an administrator of a hospital, nursing or convalescent home or other health care facility; or

"(xi) a corporation or other organization operating a hospital, nursing or convalescent home or other health care facility; or

"(2) individuals licensed to practice veterinary medicine under the laws of this Commonwealth."

6. 63 P.S. §425.4, entitled *Confidentiality of review organization's records* states:

"The proceedings and records of a review committee shall be held in confidence and shall not be subject to discovery or introduction into evidence in any civil action against a professional health care

the Peer Review Protection Act and due to the nature of the practice of medicine and the level of skill necessary to practice medicine and related areas, medical professionals and healthcare facilities are in the best position to police their own activities. *Corrigan v. Methodist Hospital,* 857 F. Supp. 434 (E.D. Pa. 1994), *re'hrg denied; Dodson v. Deleo,* 872 A.2d 1237 (Pa. Super. 2005). Protection is provided under PRPA to those items of discovery subject to peer review proceedings to ensure "comprehensive, honest and potentially critical evaluations of medical professionals by their peers." *Dodson, supra* at 1242; 63 P.S. §§425.1-425.4. Yet, there are limitations to the protections granted by the PRPA. The *Dodson* court noted that the Peer Review Protection Act, which protects documents related to peer review from discovery or introduction into evidence in civil action against a professional health care provider, does not protect non-peer review business records, even if those records eventually are used by peer review committee. 63 P.S. §§425.1-425.4. In *Dodson,* the discovery docu-

---

provider arising out of the matters which are the subject of evaluation and review by such committee and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to any evidence or other matters produced or presented during the proceedings of such committee or as to any findings, recommendations, evaluations, opinion or other actions of such committee or any members thereof: Provided, however, that information, documents or records otherwise available from original sources are not to be construed as immune from discovery or use in any such civil action merely because they were presented during proceedings of such committee, nor should any person who testifies before such committee or who is a member of such committee, be prevented from testifying as to matters within his knowledge, but the said witness cannot be asked about his testimony before such a committee or opinions formed by him of said committee hearings."

ments under scrutiny were sought in a medical malpractice action and were generated and used only by the hospital's peer review department and therefore were found to be privileged under the PRPA. The particular documents subject to the court's review included credentialing records and reports which charted problems and potential problems with the alleged negligent doctor's performance while working at the medical facility. The court concluded, after a review of the reports, that the documents were created as peer review material and therefore subject to protection of the PRPA.

At 65 P.S. §425.4, entitled, "Confidentiality of review organizations records" as the very first sentence the statute states, "[t]he *proceedings and records of a review committee* shall be held in confidence and shall not be subject to discovery or introduction into evidence in any civil action against a health care provider arising out of matters which are the subject of evaluation and never by such committee." (emphasis added) Also at 65 P.S. §425.2, "peer review" is defined as, "the procedure for evaluation by professional health care providers of the quality and efficiency of services ordered or performed by other professional health care providers." A "review organization" is any committee engaged in peer review. Despite this broad definition, the confidentiality afforded peer review organizations is not absolute nor all encompassing. At 65 P.S. §425.4 noted above, the statute goes on to say that "information, documents or records otherwise available from original sources are *not* to be construed as immune from discovery." (emphasis added)

With this backdrop, this court has performed its own in camera review of the disputed documents which we should address as presented below.

## Document (12) Performance Improvement
## Plan Dated April 24, 2001

This document does not deal at all with professional skills needing to be evaluated by other professionals. It does not deal with events of treatment nor is the document prepared for purposes of peer review. This performance improvement plan deals with Steve Adams R.N.'s excessive use of "PTO," which we interpret to mean paid time off. The document indicates that R.N. Adams needs to decrease his unscheduled use of PTO, which he signed, as did his supervisor who also prepared the document. Subsequently, an administrative officer also signed off on the document. The attempt to bar this document is clearly disingenuous by the defense. Their position here is totally lacking in both merit and of substance, and therefore the decision of the special discovery master is sustained. This document appears to be a human resources related document having absolutely nothing to do with peer review or the exercise of a professional health care employer or the professional skills in patient care and treatment.

## Documents (15)-(19) Performance Appraisal
## and Development Plan

A review of this multi-page document clearly shows that it also is human resources related and oriented as opposed to the proceedings and records of a peer review committee. A rater, Nurse Adams' supervisor rates the employee's performance and signs as both the rater and the department head, as does the employee. The appraisal and development plan explores questions related to: pa-

tient privacy not treatment; adherence to the dress code; how the employee accepts criticism; how the employee observes hours of work attendance; and other such issues. Another part of the same appraisal and development plan deals with duties and evaluates whether the employee "meets expectations" (ME) or "needs improvement" (NI). These various duties are patient related, but generic in nature. Other questions posed by these documents include: How does the employee assess the patient's physical, emotional and spiritual needs; how does the employee prioritize his activities to insure proper and appropriate management of workload to maximize utilization of human and material resources; how does the employee promote a team approach or document patient information generally; how are the employee's skills in communication and taking initiative, etc.

As noted above the defendants' position is without both substance and/or merit as this set of documents is related to human resources, not peer review.

Document (23) Department of
Nursing Orientation Checklist Evaluation

This is perhaps the best example of the defendants' disingenuous position. This checklist merely documents that an employee has received orientation in a number of areas, many unrelated to treatment, such as conduct and appearance policies, phone and fire drill procedures. The items on the checklist that are related to health care and treatment are generic and general, only documenting that the employee received his proper orientation as to hospital patient rules and regulations; infection control; nursing department procedures; medical emergency

procedures, etc. It is noteworthy that the only use the orientation checklist has is that it establishes what Nurse Adams completed during his orientation. It does not state how Adams performed, only that on a date certain, this orientation was completed and it includes the initials of the person who conducted the orientation.

It is beyond cavil that such a checklist document, totally unrelated to patient care, could ever be construed as peer review since it does not even involve patient interaction, but only the orientation procedures of the new employee. This is yet another human resources department document that the defense tries to dress up in a costume of confidentiality. Once again, the defense position is totally devoid of substance and/or merit.

### Document (31) Infection Control Orientation Checklist

For the reasons articulated at number 23, this document also fails as peer review protected. It is a human resources document not involving the care of an individual patient. It is a checklist documenting that the employee has had his infection control orientation. Specific matters are noted as completed, and the document is signed by the supervisor and counter-signed by the employee, as is document 23.

Document 31 was not prepared solely for peer review, but to document employee orientation and training. It is devoid of any reference to, or recording of, events regarding treatment of patients. As such, it fails miserably as protected peer review material. The defense position is once again equally devoid of any merit and/or substance.

## Documents (59)-(62) Marworth
## Telephone Reference Check

These forms represent the hospital human resources department's contacts made while checking the references that Nurse Adams included on his application for employment. According to the reference check materials, separate calls were made to George Slocum and Kathleen Rooney of the Northeast Veteran's Center, assessing Steven Adams' character and prior employment. Once again, we find these documents to be devoid of any matters prepared for the purpose of peer review. Additionally, these documents are dated prior to the incident under review. Resultantly, these documents cannot be related to treatment of the patient. Documents 59 through 62 do not bear even a remote resemblance to those provided peer review protection. Likewise, the defense position does not bear the most remote resemblance to having either substance and/or merit.

## Document 66 Marworth Interview Sheet

This document was generated as a part of the interview process related to Nurse Adams' initial employment on May 22, 2000, more than one month prior to the incidents which give rise to this case. It is totally unrelated to patient care and/or peer review. It does not deal with the proceedings and records of a review committee. This document is comprised only of notes of an interview between Nurse Adams and his soon to be supervising nurse prior to the establishment of an employee/employer relationship from a prior agency relationship. This human resources document could never be construed as peer review protected under our statutory scheme.

The exercise to review this matter, initially by our special trial master for discovery issues, and again during appeal to this court, represents a lack of candor to both tribunals by the defense counsel. The defense has caused a huge waste of time for our discovery master and now for this court, especially when it involves in camera review. Defendants' position has never had a shred of merit or substance and was continuously disingenuous in its totality. The court could only speculate as to their *real motives*, whether they are dilatory or otherwise. (emphasis added) This tribunal's only regret is that the court and discovery master cannot hold defense counsel to task for this huge waste of both the special trial master's and this court's time performing a second in camera review.

Upon our detailed review of the challenged decision pertaining to all the documents at issue composed of "checklists," "plans," and other "evaluations," together with the scope of discovery and relevant case law, we find absolutely no basis to disturb the determination of Special Trial Master Campagna. The purpose of the appointment of a special trial master/discovery master is to assist the court with particular issues involved in a matter. We find there has been extraordinary effective assistance by the special trial master and that there has been no abuse of discretion, nor does there exist any error of law made by the capable special trial master appointed to assist all of our court in discovery issues. Therefore, absent any remotely persuasive authority by the defendant, we shall sustain Master Campagna's decision, dated November 2, 2005.

An order consistent with this memorandum follows:

## ORDER

And now, to wit, July 14, 2006, upon consideration of the defendants' petition to appeal the decision from special trial master dated November 2, 2005, the verbal and written arguments of counsel, and in accordance with the preceding memorandum, it is hereby ordered and decreed that the decision of Special Trial Master Campagna is hereby sustained in its totality and the appeal of the decision of the special trial master by the defendant is denied and dismissed as totally lacking in both substance and merit. All disputed documents are to be provided within 10 days of this order.